Trever Orande ROBERTSON,
Appellant

v.

The STATE of Texas.

No. PD–325–05.

Court of Criminal Appeals of Texas.

March 22, 2006.

Stan Schwieger, Waco, for Appellant.

K.C. Odom, Asst. County & District Atty., Groesbeck, Matthew Paul, State's Atty., Austin, for State.

## OPINION

HERVEY, J., delivered the opinion for a unanimous Court.

This is an ineffective-assistance of counsel case. We granted discretionary review to decide whether, as a matter of federal constitutional law, appellant's trial lawyer performed deficiently for eliciting testimony from appellant at the guilt phase of his trial that appellant was already incarcerated on two convictions that were pending on

appeal.[1]

Appellant was charged in this case with aggravated assault. In exchange for appellant's guilty plea to this charge, the State initially offered to recommend a ten-year sentence to be served concurrently with a fifteen-year sentence that appellant was serving on one of the convictions then pending on appeal. The record of an *in camera* hearing just prior to voir dire on the aggravated assault charge reflects:

Q. [APPELLANT'S TRIAL LAWYER]: Trever, you and I have talked about, at the Gurney Unit in Palestine, here in Groesbeck, and then again this morning, the plea offer that the DA's office has offered you, have we not?

A. [APPELLANT]: Yes, sir.

Q. And I've told you that their offer was for ten years to do in TDC.

A. Yes, sir.

Q. With a finding of a deadly weapon.

A. Yes, sir.

Q. And would that sentence, if the judge were to approve it, that the sentence would run concurrent alongside of the [fifteen-year] sentence you're currently serving out of Freestone County, is that correct?

A. Yes, sir.

Q. And you have told me that you are not interested in a plea bargain, is that correct?

A. Yes, sir.

Q. And you don't want to plea; you want a jury trial. Is that correct?

A. Yes.

Q. And you understand that you won't have another opportunity to—you can't change your mind later on.

A. Yes, sir, I understand.

Q. So, after we start now, and at this time you're electing that, if you're found guilty, for the jury to assess punishment, is that correct?

A. Yes, sir.

Q. And so, now, you may have the opportunity later on to change your mind on that, but you won't have the opportunity to change your mind about the plea, you understand?

A. Yes, sir.

Q. And you had told me this morning that you had confidence that your attorney had a good chance to overturn the Freestone County case and for you to win your appeal, is that correct?

A. Yes, sir.

Q. And I told you that I had talked to your attorney perfecting the appeal, and he was not confident at all that you would win. I told you that, didn't I?

A. Yes, sir.

Q. But, yet, you don't want to do the plea.

A. No, sir.

Q. And you understand that, in all likelihood, if the—it's nearly a guarantee, if you're found guilty, that any sentence the jury or the judge may give you would be stacked on top of whatever you may or may not have in Freestone County.

A. Yes, sir.

Q. Okay. And knowing all of that, you foresee us to go forward with the jury trial?

A. Yes, sir.

Appellant went to trial on the aggravated assault charge in May 2003. Rejecting

---

**1.** This case concerns only the first prong of the two-pronged federal constitutional ineffective assistance of counsel test. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (to establish ineffective assistance of counsel, a defendant must establish deficient performance and prejudice).

appellant's self-defense claim, a jury convicted appellant of this offense and sentenced him to fourteen years in prison. The evidence at trial shows that appellant stabbed the victim with a knife in the parking lot of a motel after the victim pushed or hit appellant in the face.[2] Appellant initially told the police shortly after the incident that the victim and another person (Berry) came into his motel room in a "loud" manner and attacked him. Appellant did not mention in this statement that he stabbed the victim or that he was ever in the parking lot of the motel. Appellant contradicted his initial statement to the police when he testified at trial that he stabbed the victim in self-defense in the parking lot of the motel. Appellant also testified at trial that he called 911 immediately after the incident. Police department 911 records, however, did not support this.

Primarily through his cross-examination of the State's witnesses, appellant's trial lawyer elicited testimony that could have explained most, if not all, the inconsistencies between appellant's initial statement to the police and his trial testimony. Appellant's trial lawyer also elicited testimony from which the jury could have found that the victim was a violent, weapon-carrying, drug-user who had assaulted appellant in the past. And, during his recross-examination of the victim, appellant's trial lawyer was able to reveal that the victim had a pocket knife in his shirt pocket while he was testifying at appellant's trial. On later cross-examination of the victim, appellant's trial lawyer elicited more testimony from the victim in which the victim claimed that he had never "carried any kind of knife all [his] life."

At the beginning of his direct examination of appellant, appellant's trial lawyer questioned appellant about his current incarceration on the two convictions pending on appeal. *See also Robertson v. State,* slip op. at 3, 2004 WL 2567186 (Tex.App.—Waco 2004) (appellant's trial lawyer elicited testimony from appellant that appellant "was currently incarcerated, that he had been convicted in two cases for possession of cocaine and possession of methamphetamine, and that he was in possession of a knife at the time of the arrests").

Q. [APPELLANT'S TRIAL LAWYER]: [Appellant], if you would now, I want to ask you to answer the questions loud enough that the court reporter can hear your answers, the judge can hear your answers, I can hear your answers, and probably most important, that the jury can hear your answers. So try to answer clear and precise, and try to answer the question that's asked.

2. The facts from the opinion of the Court of Appeals show:

The alleged victim, Manual Bluitt, testified that he and Michael Berry went to [appellant's] motel room to retrieve some compact discs and clothing that [appellant] had borrowed. [Appellant] and a lady friend testified that they were engaging in sexual activity in the room when Bluitt and Berry knocked repeatedly on the door. [Appellant] testified that after a verbal argument with the two, he agreed to go downstairs to get the compact discs and clothing out of the car. He also testified that Bluitt wanted him to accompany Bluitt to get some [drugs] and that he refused. Bluitt testified that once the three men were in the parking lot, [appellant] refused to give Bluitt and Berry their belongings and continued to argue with them. Bluitt testified that he pushed [appellant] in the face with his open hand, that [appellant] fell back laughing, and that [appellant] then stabbed him with a knife. [Appellant] testified that Bluitt hit him in the face, that they "tussled," that Berry held one of his arms, and that he pulled out his knife and stabbed Bluitt.

*Robertson v. State,* No. 10–03–00265–CR, slip op. at 1–2, 2004 WL 2567186 (Tex.App.-Waco, delivered November 10, 2004) (not designated for publication).

For the record, please state your full name.

A. [APPELLANT]: My name is Trever Orande Robertson.

Q. And how do you pronounce your middle name?

A. Orande.

Q. Orande?

A. Yeah.

Q. And how old are you?

A. I'm 25.

Q. And currently, are you incarcerated in TDC?

A. Yes, sir, I am.

Q. And since when have you been there?

A. I've been there since May the 21st. I mean, October 21st.

Q. October the 21st of 2002?

A. Yes, sir.

Q. Now, is that on a sentence out of Freestone County?

A. Yes, sir.

Q. And did you—the jury found you guilty; is that correct?

A. Yes, sir.

Q. And you're currently got that decision under appeal; is that correct?

A. Yes, sir.

Q. Because you disagree with some of the things—how they that transpired in court; is that correct?

A. Yes, sir.

Q. Now, was the sentence there for fifteen years?

A. Yes, sir.

Q. Okay. And in addition, when you were arrested in Freestone County, did they find a switch blade on your person, on you?

A. Yes, sir.

Q. You hadn't used the knife on anybody?

A. No, sir.

Q. You didn't use it on the police?

A. No, sir.

Q. And not on nobody [sic] else; is that correct?

A. Yes, sir.

Q. But it was on—it was either on your person or in your things; is that correct?

A. Yes, sir.

Q. And so they had a finding of a deadly weapon on that charge; is that correct?

A. Yes, sir.

Q. Okay, in addition to that, had you had a prior conviction either in Freestone or Limestone or someplace where you were on probation for possession for some type of illegal substance?

A. Yes, sir.

Q. And tied in with the conviction in Freestone County, did you subsequently or possibly prior to that trial date get your probation revoked and get sentenced on that case?

A. Yes, sir.

Q. And do you know what the sentence was on that case?

A. They ran it concurrent with—with the fifteen years.

Q. But do you know for how many years?

A. Two.

Q. Two years?

A. Yes.

Q. So it was like a state jail fine?

A. Yes, sir.

Q. But it's running concurrent with the fifteen years. So you've actually got two sentences that you're serving time on right now; is that correct?

A. Yes, sir.

This questioning opened the door to some damaging cross-examination by the prosecution, which also referred to appellant's two convictions during its closing jury arguments.[3] Appellant's trial lawyer argued to the jury that appellant was afraid of the victim and that he acted in self-defense.

> Now, [the victim] sat there on the stand, said that prior to his girlfriend giving him his current knife that he had in his pocket—by the way, y'all saw him open it and just kind of slide that thing up and flip that thing open. It didn't look like the first time he had ever done that. Might have been. We don't know.

> But when I asked him right there, had he ever carried a knife, no, he'd never carried any kind of a knife, not even when he was a boy, not to go fishing. But Neva Coleman said she had seen him with a gun, she had seen him with a knife in the past. Not each and every time she had seen him, but he had been known to carry weapons with him and on his person. He's a known drug dealer. But, again, [the victim] said he never carried a knife.

> [Appellant] knew [the victim] also. When they start the fight, [the victim] hits [appellant], the fight starts. He testifies that Berry grabs an arm, but he's already gotten a hand in his pocket, got his knife out, Berry grabs his arm, he comes back, he gets his knife open, he stabs him.

> He says he was in fear of being hurt by [the victim]. He is in fear. What he knows, in November he calls the police on [the victim]. He—now whether [appellant] is bigger than [the victim] is irrelevant. Fear is fear. Evidently [the victim] may be tougher. He certainly looks like he's in better condition. So this is the thing that you all are going—one of the things you'll have to decide is who do you believe in this?

Appellant's trial lawyer did mention appellant's current incarceration on the two convictions during the very end of his closing jury arguments.

> So we ask after considering all the testimony from the witness stand, considering [the State's] and myself's closing arguments, that you do the right thing in this case and vote not guilty in this case. [Appellant] is already in TDC serving a fifteen-year sentence. But in this case, not guilty. Thank you.

After he was convicted and sentenced, appellant filed a *pro se* motion for new trial. Appellant alleged in paragraph III of this motion that he felt "mislead by his State appointed Counsel. Due to it being a matter of self defense in his own room."[4] Paragraph III of appellant's *pro se* motion for new trial did not expressly allege that his trial lawyer was ineffective for eliciting the testimony from appellant about his incarceration on the two convictions. The trial court initially denied a request by appellant's newly appointed appellate law-

---

3. In his brief on discretionary review, appellant characterizes this as the State "dumping salt into the wounds inflicted by his own counsel." For example, the State argued during its closing jury arguments:
> They want to talk about guns and knives. The only weapon in this case is this one with [the victim's] blood that came from [appellant] when he stuck him.
> Talked about seeing [the victim] with a knife in the past. We know [appellant] has

knives in his past. One, because he stuck a guy with this one. Two, because we got deadly weapon findings on two judgements [sic] and both of them are knives in Freestone County. He seems to be somehow proud of the fact that he's doing fifteen years for that. He's the one that [sic] brought that up.

4. Sic passim.

yer to present evidence on this claim at the hearing on the motion for new trial because "the alleged misleading [in paragraph III of appellant's *pro se* motion for new trial did] not relate to the issue of improperly submitting an extraneous offense." The trial court permitted appellant's newly appointed appellate lawyer to make a bill of exception on this ineffective assistance of counsel claim.

In relevant part, appellant's trial lawyer testified on direct examination during this bill of exception that he decided to elicit the testimony from appellant about appellant's incarceration on the two convictions.

Q. And, on occasion, in Limestone County, were you appointed to defend [appellant]?

A. I was.

Q. And that was on aggravated assault indicates [sic], is that correct?

A. I believe that's correct.

Q. This matter proceeded to trial?

A. Yes.

Q. And it's my understanding that, several times during the trial, you went on the record at some point and stated that you felt that the case probably should have been handled by a plea bargain at some point. Would that be correct?[5]

A. That is correct.

Q. And was it also your understanding, at the time, that this—that your aggravated assault case was going on that he had been convicted in the 87th District Court, I believe, here in Freestone County.

A. That's correct.

Q. And that matter was a possession with intent to distribute a controlled substance, your recollection?

A. I'm not sure what the conviction was. I understand that [appellant] went to the jury and the jury found him guilty.

\* \* \*

Q. To your recollection, Mr. Tate, was that case on appeal at the time that your case was being tried in Limestone County?

A. Yes, it was.

Q. And during the trial, [appellant] chose to take the witness stand, is that correct?

A. That's correct.

Q. And was it your decision to educe, or bring out, the fact that he had been convicted in Freestone County of any felony charge?

A. It was.

Q. And, again, that was still on appeal at the time.

A. It's my understanding, yes.

[APPELLATE LAWYER]: No, further questions, Your Honor.

On cross-examination, appellant's trial lawyer testified that he and appellant decided to inform the jury about appellant's two convictions as part of a trial strategy to convince the jury that appellant was not a liar.

Q. [STATE]: [Appellant] in fact wanted—he demanded he be allowed to testify in this case, didn't he?

A. [TRIAL LAWYER]: Yes, he did. And we talked about whether to bring it [the two convictions] up. And trial strategy at that time, I guess, I recom-

---

5. The record reflects that on the day before trial on the aggravated assault charge appellant rejected another offer from the State for appellant to plead guilty to this charge in exchange for a recommended sentence of eight years "to run concurrent to any other sentence that [appellant might] currently be serving."

mended that—that we tell the jury that there was a conviction out of Freestone County.

Q. One of the important things, with respect to trying to defend [appellant] on the self-defense theory, was trying to convince the jury he was up there telling the truth, wasn't it?

A. Yes.

Q. So, as part of your trial strategy, you felt it was appropriate to have [appellant] let the jury know about this case.

A. Yes.[6]

On redirect examination, appellant's trial lawyer testified that he was "now aware" that TEX.R. EVID. 609 would not have allowed the State to impeach appellant with the convictions that were pending on appeal.[7] The trial court changed its earlier ruling, and decided that appellant could pursue his ineffective assistance of counsel claim "during his Motion For New Trial" because the term "misled" is "very general" and it was "conceivable that [appellant] raised the issue of ineffective as-

sistance of counsel under paragraph III [of his *pro se* motion for new trial]." The trial court ultimately denied appellant's motion for new trial and found that the "decision to inform the jury of the extraneous offense was a matter of trial strategy."

■ On direct appeal, the Court of Appeals decided that the actions of appellant's trial lawyer in introducing the evidence of appellant's incarceration on the two convictions was a sound trial strategy "of convincing the jury that [appellant] was telling the truth, and thereby convince the jury to believe [appellant's] self-defense claim." *Robertson,* slip op. at 4. We granted review. The ground upon which we granted review states:

> Is the impeachment of a defendant by defense counsel with an inadmissible conviction "deficient" behavior under a *Strickland v. Washington* analysis?[8]

In *Strickland,* the Supreme Court stated that a lawyer's obligation "to assist the defendant" includes duties "to consult with the defendant" and "to bring to bear such skill and knowledge as will render the trial

---

**6.** Appellant testified at the motion for new trial hearing that he told his trial lawyer not to elicit this information.

> Q. [APPELLATE LAWYER]: How did you understand that to mean when you wrote it, trying to get the point out to the Court?
> A. [APPELLANT]: Well, my attorney, Greg Tate, at the time, he told me that he felt like it would be best that we bring that case out that I was—that I was on appeal for, but I had told Mr. Tate not to.

**7.** Appellant's trial lawyer testified on redirect examination:

> Q. [APPELLATE LAWYER]: Let me re-phrase my question. You're now aware that [Rule 609 does] not allow the State to impeach him with that conviction.
> A. [TRIAL LAWYER]: Yes.
> Q. Okay. So, whether it was to give the appearance of truthfulness or not, that's something that would have been collateral because the State couldn't have brought

that in, in the first place, and made him look like he was lying, if you withheld it.
> A. Correct.

**8.** The claim literally made in this ground is that appellant's trial lawyer performed deficiently because he "impeached" appellant with an inadmissible conviction. *See* TEX.R. EVID. 609(a) (setting out general rule for impeachment by evidence of conviction of crime); TEX.R. EVID. 609(e) (pendency of an appeal renders evidence of a conviction inadmissible for impeachment purposes).

The record, however, reflects that appellant's counsel was not "impeaching" appellant with these convictions. *See Robertson,* slip op. at 3–4. The claim literally made in this ground, therefore, is not presented in this case, and we do not address the decision of the Court of Appeals with the premise that appellant's trial lawyer was "impeaching" his own client under Rule 609(a) with an inadmissible conviction under Rule 609(e).

a reliable adversarial testing process." *See Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. The Court in *Strickland*, 466 U.S. at 688-90, 104 S.Ct. 2052, further stated:

These basic duties neither exhaustively define the obligations of counsel nor form a checklist for judicial evaluation of attorney performance. In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, (citation omitted), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. (Citation omitted). Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all to easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. (Citation omitted). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." (Citation omitted). There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. (Citation omitted).

The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intrusive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case,

viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

■■■ Our case law states that it is the defendant's burden to prove by a preponderance of the evidence that trial counsel's performance was deficient or not "reasonably effective" by showing that counsel's performance fell below an objective standard of reasonableness based on prevailing professional norms. *See Rylander v. State,* 101 S.W.3d 107, 109–110 (Tex.Cr. App.2003); *McFarland v. State,* 845 S.W.2d 824, 842 (Tex.Cr.App.1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993); *Ingham v. State,* 679 S.W.2d 503, 509 (Tex.Cr.App.1984). The "right to effective assistance of counsel merely ensures the right to reasonably

effective [not perfect] assistance." *See id.* This right does not mean errorless or perfect counsel whose competency of representation is to be judged by hindsight. *See McFarland,* 845 S.W.2d at 843, *Ingham,* 679 S.W.2d at 509.

■■■ "Isolated instances in the record reflecting errors of omission or commission do not render counsel's performance ineffective, nor can ineffective assistance of counsel be established by isolating one portion of trial counsel's performance for examination." *McFarland,* 845 S.W.2d at 843. Counsel's performance is judged by "the totality of the representation" and, "judicial scrutiny of counsel's performance must be highly deferential" with every effort made to eliminate the distorting effects of hindsight. *See id.; Ingham,* 679 S.W.2d at 509. The Supreme Court in *Strickland* cautioned that intrusive post-trial inquiry into attorney performance should be avoided because that would encourage the proliferation of ineffectiveness challenges. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.[9]

Initially, we note that the record in this case does not support a finding that appellant's trial lawyer elicited the testimony of appellant's incarceration on the two convictions because he thought the prosecution could use this information to impeach appellant.[10] And, assuming counsel's challenged action, though strategic, could not be considered soundly strategic,[11] that would not necessarily establish that trial counsel performed deficiently under the

---

**9.** *But see Ex parte Chandler,* 182 S.W.3d 350, 354 n. 6 (Tex.Cr.App., 2005) (discussing the proliferation of ineffectiveness challenges).

**10.** *See* Rule 609(e); *Commonwealth v. Moore,* 715 A.2d 448, 452 (Pa.Super.Ct.1998) (defense counsel errs to introduce evidence of defendant's prior convictions for purpose of preventing prosecution from first bringing out such evidence on cross-examination when the

prior convictions are unavailable to the prosecution for impeachment purposes).

**11.** *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (defendant claiming ineffectiveness of counsel must overcome presumption that the challenged action "might be considered sound trial strategy").

first prong of *Strickland* because counsel's performance must be judged by the totality of the representation. *See McFarland,* 845 S.W.2d at 843.

In this case, appellant's trial lawyer testified that he elicited the evidence of appellant's incarceration on the two convictions after consulting with appellant. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052 (counsel has duty to consult with defendant on important decisions). And, we may presume that appellant's trial lawyer fully explained to appellant the possible consequences of bringing out this information. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (courts must indulge strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance).[12] We further note that appellant's trial lawyer, primarily through his cross-examination of the State's witnesses, made a case for self-defense.

Even though the performance of appellant's trial lawyer may not have been perfect, the assistance that he did provide arguably was reasonably effective under the particular circumstances of this case. *See Ingham,* 679 S.W.2d at 509 (right to effective assistance of counsel merely ensures the right to reasonably effective, not perfect, assistance). On this record, it is fairly debatable whether counsel's performance rendered the trial an unreliable adversarial testing process and deprived appellant of a fair trial. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 ("the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial"); *Chandler,* slip op. at 4 n. 6.

Nevertheless, in cases like this where appellant's self-defense claim rested almost entirely on his credibility, the weight of authority supports a holding that appellant's trial lawyer performed deficiently under the first prong of *Strickland* by allowing the jury to hear prejudicial and clearly inadmissible evidence because this evidence could serve no strategic value including demonstrating that appellant is not a liar. *See Ex parte Menchaca,* 854 S.W.2d 128, 131–33 (Tex.Cr.App.1993) (there could be no strategic basis for allowing the jury to hear that defendant previously had been convicted of the same offense for which he stood trial);[13] *see also Harding v. Sternes,* 380 F.3d 1034, 1043–45 (7th Cir.2004), *cert. denied,* 543 U.S. 1174, 125 S.Ct. 1367, 161 L.Ed.2d 155, 73 U.S.L.W. 3496 (2005); *Lyons v. McCotter,* 770 F.2d 529, 532–35 (5th Cir.1985) *cited* in this Court's decision in *Menchaca,* 854 S.W.2d at 132; *Moore,* 715 A.2d at 451–52; *State v. Hawthorne,* 230 Neb. 343, 431 N.W.2d 630, 636 (1988); *Commonwealth v. Candia,* 286 Pa.Super. 282, 428 A.2d 993,

---

**12.** The record also supports a finding that appellant assented to the presentation of this information to the jury. Despite appellant's assertions to the contrary, the trial court did not have to believe appellant's testimony at the motion for new trial hearing that he told his trial lawyer not to elicit this information. *See generally Guzman v. State,* 955 S.W.2d 85 (Tex.Cr.App.1997).

**13.** The opinion in *Menchaca* decided that trial counsel performed deficiently for permitting the defendant to be impeached with a prior conviction when the law was unsettled on whether that prior conviction could be used for impeachment. *See Menchaca,* 854 S.W.2d at 130–32; *but see Vaughn v. State,* 931 S.W.2d 564, 566–67 (Tex.Cr.App.1996) (basing an ineffective assistance of counsel claim on case law that is unsettled at the time of counsel's actions "would be to engage in the kind of hindsight examination of effectiveness of counsel the Supreme Court expressly disavowed" in *Strickland*).

996 (1981). The State cites no contrary authority directly on point and our independent research has not found any either.[14]

The Court's discussion in *Candia*, which was decided prior to *Strickland* but which applied essentially the attorney performance standard discussed in *Strickland*, illustrates this case law. The Court's opinion in *Candia*, 428 A.2d at 996, states:

> Candia charges that his [trial] counsel improperly extracted testimony from him—regarding previous crimes—which subjected him to Commonwealth questioning which drew his character into disrepute. Candia answered [trial] counsel's questions with the understanding that their purpose was to cause Candia to demonstrate his honest recollections of past criminal acts. In this fashion, appellant was to prove himself credible. Appellant, however, was subjected to cross-examination which ridiculed his character with the introduction of his past drug-related criminal activity. Appellant's counsel objected strenuously but to no avail. The trial court

permitted the Commonwealth's line of questioning.

The Court's opinion in *Candia*, 428 A.2d at 996, decided that Candia's trial counsel performed deficiently:

> Furthermore, the testimony elicited on direct examination opened the door to cross-examination on Candia's previous crimes. Trial counsel's strategy in seeking this testimony was grossly inappropriate for the purposes he sought to achieve. The right to full cross-examination which does not go beyond the scope of direct examination is guaranteed. (Citation omitted). Trial counsel's decision to question the appellant about his past criminal acts served only to invite very damaging cross-examination by the Commonwealth.

> Certainly [an effective trial counsel] would not have placed Candia on the stand under a theory so tenuous as to believe admission of previous criminal acts would demonstrate credibility. Even if so incredible a theory were possible, no reasonable strategy would follow which included the invitation to the

**14.** In its brief, after conceding that it could not use appellant's incarceration on the two convictions to impeach appellant, the State makes the following arguments, which we do not find persuasive:

> Further, appellants [sic] trial attorney stated he had informed the appellant that his case was not a strong case for self defense, but appellant demanded to testify and that appellant had stated that the jury would understand. (Footnote omitted). Faced with the fact that the appellant would testify defense counsel had to use the best defense and strategy that could be had under the particular facts and circumstances of the case. It can hardly be said that pursuing a completely truthful strategy is not appropriate, especially in light of a self defense theory where the whole issue is whether the appellant should be justified in his actions. (Footnote omitted). As part of this strategy, by initially offering these convictions appel-

> lant's counsel removed any harmful effects in the event, that appellant opened the door, (footnote omitted) which would have had a detrimental effect on appellants [sic] self defense theory. Appellant's trial counsel is in a much better position to judge whether appellant will open the door either directly, or inadvertently. Also as part of this strategy appellant was allowed to admit drug offenses implicating his heavy involvement in drugs. While this did paint appellant as a drug user and drug dealer, counsel also elicited testimony that victim was a drug user and dope dealer, that the other witness was a drug user, and then brought all these facts out at closing. (Footnote omitted). In essence, this also put in front of the jury that everyone who was involved and observed the incident were involved in drugs. So one could conceivably believe this incident was a dope deal gone bad, or just thug on thug crime.

Commonwealth to use evidence of previous convictions against the appellant.

We decide that appellant's trial lawyer performed deficiently under the first prong of *Strickland* for eliciting testimony from appellant at the guilt phase of his trial that appellant was already incarcerated on two convictions that were pending on appeal. It is, therefore, necessary to consider whether this deficient performance was prejudicial under the second prong of *Strickland.*

The judgment of the Court of Appeals is reversed, and the cause is remanded there for further proceedings consistent with this opinion.